George Torgun (Bar No. 222085)
Nicole C. Sasaki (Bar No. 298736)
SAN FRANCISCO BAYKEEPER
1736 Franklin Street, Suite 800
Oakland, California 94612
Telephone: (510) 735-9700
Facsimile: (510) 735-9160
Email: george@baykeeper.org
Email: nicole@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, a non-profit corporation,<br><br>Plaintiff,<br>v.<br>BERKELEY MARINE CENTER, INC. and CITY OF BERKELEY,<br><br>Defendants. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

COMPLAINT

Plaintiff San Francisco Baykeeper ("Baykeeper"), by and through its counsel, alleges as follows:

## INTRODUCTION

1.     This is a citizen suit, brought pursuant to the section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendants Berkeley Marine Center, Inc. and the City of Berkeley (collectively, "Defendants") arising out of operations at Berkeley Marine Center's full service boat yard located in Berkeley, California.  Since at least April 27, 2010, Defendants have been discharging and continue to discharge polluted stormwater from the facility located at 1 Spinnaker Way, Berkeley, California 94710 (the "Facility") in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and the General Industrial Stormwater Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("Industrial Stormwater Permit").  Baykeeper seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

3.     On April 27, 2015, Baykeeper provided notice of intent to file suit against Defendants for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") (collectively, "state and federal agencies"), and Defendants, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A).  A copy of the Notice Letter is attached as Exhibit 1.

4.      More than sixty (60) days have passed since the Notice Letter was mailed to Defendants and the state and federal agencies.  Neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## INTRADISTRICT ASSIGNMENT

6.      Intradistrict assignment of this matter to the Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(c).  The events or omissions which give rise to Baykeeper's claims occurred in Alameda County, which is under the jurisdiction of the Oakland Division of the Northern District of California.

## PARTIES

7.      Plaintiff SAN FRANCISCO BAYKEEPER is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Oakland, California.  Baykeeper's 3,000 members live and/or recreate in and around the San Francisco Bay area.  Baykeeper is dedicated to protecting the water quality of San Francisco Bay for the benefit of its ecosystems and communities.  To further these goals, Baykeeper actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in, San Francisco Bay and its tributaries, into which Defendants discharge pollutants.  These Baykeeper members use and enjoy San Francisco Bay and its tributaries for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendants' discharges of stormwater containing pollutants impair each of these uses.  Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the Industrial Stormwater Permit.

9.      Defendant BERKELEY MARINE CENTER, INC. is an active California corporation located at 1 Spinnaker Way, Berkeley, California 94710.  The September 3, 1998 "Notice of Intent" for the Facility to comply with the terms of the Industrial Stormwater Permit, and each annual report filed for the Facility since 2009 pursuant to the Industrial Stormwater Permit, named "Berkeley Marine Center, Inc." as the owner and/or operator.  Plaintiff is therefore informed and believes and thereon alleges that Berkeley Marine Center, Inc. owns and/or operates the Facility.

10.      Defendant CITY OF BERKELEY is a municipal corporation located in Alameda County, California that owns the property at 1 Spinnaker Way, Berkeley, California 94710, on which the Facility is located.  The Facility is operated by Defendant Berkeley Marine Center, Inc. under a fifty-year lease from the City of Berkeley, beginning on May 11, 1978 and ending on May 10, 2029, authorized by Ordinance No. 5037, amended July 21, 1988 by Ordinance No. 5863, and January 13, 1989 by Ordinance No. 5896.  Pursuant to the terms of the lease and other legal authorities, the City of Berkeley retains involvement and control over operations at the Facility.  Plaintiff is therefore informed and believes and thereon alleges that the City of Berkeley owns and operates the Facility.

## REGULATORY BACKGROUND

**The Problem of Stormwater Pollution**

11.      Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay.  With every rainfall event, hundreds of millions of gallons of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and the Bay.  The consensus among the state and federal agencies and water quality specialists is that stormwater pollution accounts for more than half of the total heavy metal pollution entering the San Francisco Bay watershed each year.

12.      Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate and nitrite.  Exposure and ingestion of heavy metals can cause health

problems in people and aquatic animals, including neurological, physiological, and reproductive

effects.  Heavy metals have been shown to alter activity in tissues and blood of fish.

13.     High concentrations of total suspended solids ("TSS") degrade optical water quality by

reducing water clarity and decreasing light available to support photosynthesis.  TSS have been shown

to alter predator-prey relationships (for example, turbid water might make it difficult for fish to see

their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also

be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic

hydrocarbons ("PAHs"), are adsorbed onto TSS.  Thus, higher concentrations of TSS mean higher

concentrations of toxins associated with those sediments.  Inorganic sediments, including settleable

matter and suspended solids, have been shown to negatively impact species richness, diversity, and

total biomass of filter feeding aquatic organisms on bottom surfaces.

**The Clean Water Act**

14.     CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into

waters of the United States unless the discharge is in compliance with various enumerated CWA

sections.  Among other things, CWA section 301(a) prohibits discharges not authorized by, or in

violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued

pursuant to CWA section 402, 33 U.S.C. § 1342.

15.     CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own

EPA-approved permit program for discharges.  In California, the State Board and its nine Regional

Boards have approval from EPA to administer an NPDES permit program for the State.  The State

Board and Regional Boards issue individual and general NPDES permits regulating water pollutant

discharges from various categories of dischargers.

16.     CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for

stormwater discharges "associated with industrial activity."

17.     CWA section 301(b) requires that, by March 31, 1989, all point source dischargers,

including those discharging polluted stormwater, must achieve technology-based effluent limitations

by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and

nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

18.     CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1); *see* 33 U.S.C. § 1362(5).

19.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33 U.S.C. § 1365(a).

20.     CWA violators are subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring after January 12, 2009. 33 U.S.C. § 1319(d); 40 C.F.R. §§ 19.1-19.4.

**State Regulations**

21.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

22.     The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

23.     The San Francisco Bay Regional Water Quality Control Board has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by Resolution No. R2-2010-0100, setting forth the Water Quality Standards and beneficial uses for San Francisco Bay and its tributaries.

24.     The Basin Plan sets forth, among other things, narrative Water Quality Standards for floating material, oil and grease, sediment, settleable matter, and suspended materials, and sets forth numeric Water Quality Standards for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver, tributyltin, zinc, and PAHs. *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-3.3.14, 3.3.21, and Table 3-3. The Basin Plan also includes site specific objectives ("SSOs"),

which are Water Quality Standards for specific sites, for certain pollutants of concern, including copper and nickel.  *See* Basin Plan Table 3-3A.

25.     In addition, EPA has promulgated Water Quality Standards for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which apply to San Francisco Bay and its tributaries, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

**The Industrial Stormwater Permit**

26.     In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  *See* NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Industrial Stormwater Permit").  The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).  To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.  Industrial Stormwater Permit, p. II.

27.     Violations of the Industrial Stormwater Permit are also violations of the CWA.  Industrial Stormwater Permit, Section C(1).

28.     The Industrial Stormwater Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States.  Industrial Stormwater Permit, Order Part A(1).  Discharge Prohibition A(2) of the Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.  *Id.* at Order Part A(2).  Receiving Water Limitation C(1) of the Industrial Stormwater Permit prohibits discharges that adversely impact human health or the environment.  *Id.* at Order Part C(1).  Receiving Water Limitation C(2) of the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  *Id.* at Order Part C(2).

29.     Under the CWA and the Industrial Stormwater Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution.  33 U.S.C. § 1311(b); Industrial Stormwater Permit, Order Part B(3).  EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.  NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

30.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  Industrial Stormwater Permit, Section A(1)(a) and Order Part E(2).  The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  *Id.* at Section A(2).  The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges.  *Id*.  The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT.  *Id.* at Order Part B(3).

31.     The SWPPP must include:  a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP.  Industrial Stormwater Permit, Sections A(1)-(10).

32.     The Industrial Stormwater Permit also requires facility operators to properly operate

and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times.  Industrial Stormwater Permit, Section C(5).

33.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness.  Industrial Stormwater Permit, Section A(1) and Sections B(3)-(4).

34.     Facility operators are further required to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility.  Industrial Stormwater Permit, Section B(1) and Order Part E(3).  The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit.  *Id.* at Section B(2).  The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP.  *Id.*

35.     Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges.  Industrial Stormwater Permit, Sections B(3)-(4).  Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility.  *Id.* at Sections B(5), (7).  Stormwater samples must be analyzed for pH, total suspended solids, total organic carbon (or oil and grease as a substitute), specific conductance, toxic chemicals, and other pollutants which are likely to be present in significant quantities in stormwater discharging from the facility.  *Id.* at Section B(5).

36.     On April 1, 2014, the State Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, which has no force or effect until its effective date of July 1, 2015.  As of the effective date, Water Quality Order No. 2014-57-DWQ will supersede and rescind the current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ, except for purposes of enforcement actions brought pursuant to the

current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ.

37.     Once effective, the newly adopted permit will continue to include the same or substantially similar requirements as the Industrial Stormwater Permit, as summarized in Paragraphs 26-35.  For example, the new permit will continue to require control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards.  While the new permit will also contain newly created "Numeric Action Levels" ("NALs") that trigger various procedural and substantive requirements, the new permit expressly states that NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations, and are not derived directly from either BAT/BCT requirements or receiving water objectives.

<u>STATEMENT OF FACTS</u>

**Facility Background**

38.     Defendants operate a Facility located at 1 Spinnaker Way, Berkeley, California 94710.

39.     The Facility is regulated by the Industrial Stormwater Permit.

40.     Berkeley Marine Center, Inc. submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board in 1998.

41.     Operations at the Facility generally include, but are not limited to, boat washing, boat stripping, boat sanding, boat hull repair, boat painting, and boat engine repair and maintenance.  The Facility also maintains a fuel dock, material storage areas, and waste storage areas.

42.     Some operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

43.     Vehicles, boats, and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

44.     The types of pollutants that the Facility releases into the immediate environment are known to include, or have the potential to include, among other contaminants: sediment (total suspended solids; "TSS"), heavy metals, diesel fuel, boat exterior maintenance products (sanding dust, paint, solvents), oil and grease, used oil, engine repair and maintenance products (coolant), gasoline, hydraulic oil/fluids, paint chips, litter, and other pollutants.

COMPLAINT                                                                                                          9

45.     The industrial materials stored and the pollutants generated at the Facility are exposed to stormwater flows.

46.     Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility.  During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to San Francisco Bay.

**Activities Contributing to CWA Violations**

47.     Defendants have not developed and/or implemented an adequate SWPPP at the Facility.

48.     Defendants have not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

49.     Defendants have not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

50.     Defendants have not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

51.     Defendants have not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

52.     Defendants have not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

53.     Defendants have not adequately evaluated and revised the Facility's SWPPP to address these failures.  Defendants have also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

54.     Defendants have not developed and/or implemented an adequate MRP at the Facility.

55.     Defendants' monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

56.     Defendants' monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP.

57.     Due to Defendants' lack of effective pollution prevention measures, including effective

COMPLAINT                                                                                              10

BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents.  The potential pollutants include: debris, TSS, heavy metals, diesel fuel, boat exterior maintenance products (sanding dust, paint, solvents), oil and grease, used oil, engine repair and maintenance products (coolant), gasoline, hydraulic oil/fluids, paint chips, litter, and other pollutants.  Pollutants become entrained in stormwater when such water flows over and across the outdoor areas of the Facility.

58.     Polluted stormwater is discharged from the Facility into San Francisco Bay.  San Francisco Bay is a water of the United States.

59.     Defendants' annual stormwater sampling results indicate that the Facility's discharges of stormwater are consistently contaminated with higher levels of pollutants than are permissible under the Industrial Stormwater Permit.

60.     Defendants' annual stormwater sampling results indicate that the Facility's discharges of stormwater are regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT.

61.     Defendants' repeated stormwater exceedances of EPA Benchmarks over the past five years for pollutants including aluminum, copper, iron, and pH indicate that Defendants have failed and continues to fail to meet BAT/BCT.

**CLAIMS**

**FIRST CLAIM FOR RELIEF**

**Discharges in Violation of Permit Prohibitions of the Industrial Stormwater Permit**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

62.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

63.     Discharge Prohibition A(2) of the Industrial Stormwater Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the Industrial Stormwater Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a

violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

64.     Since at least April 27, 2010, Defendants have been discharging polluted stormwater from the Facility in violation of the prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain).  *See* Exhibit 1, Notice Letter at Attachment 2.

65.     The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of Receiving Water Limitation C(1) of the Industrial Stormwater Permit.

66.      Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of Discharge Prohibition A(2) of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

67.     Each day since at least April 27, 2010 that Defendants have discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

68.     By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

69.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

70.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CLAIM FOR RELIEF

**Discharge in Violation of Effluent Limitations of the Industrial Stormwater Permit**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

72.     The Industrial Stormwater Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

73.     Defendants have discharged and continue to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from April 27, 2010 through the present.  Defendants' failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of Effluent Limitation B(3) of the Industrial Stormwater Permit and the CWA.  *See* Industrial Stormwater Permit, Order Part B(3); 33 U.S.C. § 1311(b).

74.     Each day since at least April 27, 2010 that Defendants have discharged stormwater containing pollutants in violation of Effluent Limitation B(3) is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

75.     Defendants' CWA violations described in the paragraphs above will continue in the future until Defendants develop and implement BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

76.     By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

77.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

COMPLAINT                                                                                                    13

78.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### THIRD CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan,**

**in Violation of the Industrial Stormwater Permit**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

79.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

80.     Section A and Order Part E(2) of the Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

81.     Defendants have failed and continue to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit, Sections A(1), (2), (8), and (9) and Order Part E(2).

82.     Defendants have failed and continue to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of Section A.

83.     Defendants have failed and continue to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit as required by Section A.

84.     Each day since April 27, 2010 that Defendants have failed to adequately develop and/or implement a SWPPP for the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

85.     Defendants have been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since April 27, 2010.  Defendants will continue to be in violation of the SWPPP requirements each day that Defendants fail to develop and fully implement an adequate SWPPP for the Facility.

86.     By committing the acts and omissions alleged above, Defendants are subject to an

assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

87.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

88.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CLAIM FOR RELIEF

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program,**

**in Violation of the Industrial Stormwater Permit**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

89.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

90.     Section B and Order Part E(3) of the Industrial Stormwater Permit require dischargers of stormwater associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

91.      Defendants have failed and continue to fail to develop and implement an adequate MRP or to implement all necessary revisions to the MRP as required by the Industrial Stormwater Permit.

92.     Defendants' MRP has failed and continues to fail to ensure that discharges from the Facility are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations as required in Sections B(2) and (10) of the Industrial Stormwater Permit.

93.     Defendants have failed and continue to fail to effectively identify compliance problems at the Facility or to effectively revise the SWPPP to address such pollution problems as required by Sections B(2)-(4) of the Industrial Stormwater Permit.

94.     Defendants have failed and continue to fail to monitor all pollutants which are likely to

be present in significant quantities in stormwater discharging from the Facility, or all stormwater discharge locations, as required by Section B(5) of the Industrial Stormwater Permit.

95.     Each day since April 27, 2010 that Defendants have failed to develop and implement an adequate MRP for the Facility in violation of the Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

96.     Defendants have been in violation of the MRP requirements every day since April 27, 2010.  Defendants will continue to be in violation of the MRP requirements each day that Defendants fail to develop and fully implement an adequate MRP for the Facility.

97.     By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

98.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

99.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CLAIM FOR RELIEF

### Unpermitted Discharge of Pollutants in Violation of CWA Section 301(a)

### (Violations of 33 U.S.C. § 1311)

100.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

101.    Defendants have discharged and continue to discharge pollutants from the Facility absent compliance with the Industrial Stormwater Permit.  Thus, Defendants' discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

102.    Defendants have been in violation of CWA section 301(a) every day it has discharged stormwater from the Facility to waters of the United States since April 27, 2010.  Defendants will

COMPLAINT                                                                                            16

continue to be in violation of the CWA each day that they have unpermitted stormwater discharges from the Facility to waters of the United States.

103.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

104.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

105.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## RELIEF REQUESTED

Baykeeper respectfully requests this Court to grant the following relief:

1.    Declare Defendants to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Stormwater Permit;

2.    Enjoin Defendants from discharging pollutants from the Facility to stormwater discharge points, which discharge to San Francisco Bay;

3.    Order Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facility;

4.    Enjoin Defendants from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

5.    Order Defendants to pay civil penalties of up to $37,500 per day for all violations occurring after January 12, 2009 in accordance with CWA section 309(d), 33 U.S.C. § 1319(d) and 40

C.F.R. §§ 19.1-19.4;

6.     Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d);

7.     Award such other relief as this Court may deem appropriate.


Dated:  June 30, 2015                    Respectfully Submitted,


                                         /s/ Nicole C. Sasaki
                                         _____

                                         Nicole C. Sasaki
                                         Attorney for Plaintiff
                                         SAN FRANCISCO BAYKEEPER

COMPLAINT                                                                18

Exhibit 1



SAN FRANCISCO
# BAYKEEPER®

April 27, 2015

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Cree Partridge, Owner                    Agent for Service of Process
Berkeley Marine Center, Inc.             City of Berkeley
1 Spinnaker Way                          City Clerk
Berkeley, California 94710               2180 Milvia Street, 1st Floor
                                         Berkeley, California 94704

Agent for Service of Process
Berkeley Marine Center, Inc.
Christopher Partridge
1 Spinnaker Way
Berkeley, California 94710

**Re:     Notice of Violation and Intent to File Suit under the Clean Water Act**

Dear Sirs:

I am writing on behalf of San Francisco Baykeeper ("Baykeeper") to give notice that Baykeeper intends to file a civil action against Berkeley Marine Center, Inc. and the City of Berkeley (collectively, "BMC") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA") at BMC's facility located at 1 Spinnaker Way, Berkeley, California (the "Facility").

Baykeeper is a non-profit public benefit corporation organized under the laws of California, with its office in Oakland, California. Baykeeper's purpose is to protect and enhance the water quality and natural resources of San Francisco Bay, its tributaries, and other waters in the Bay Area, for the benefit of its ecosystems and communities. Baykeeper has over three thousand members who use and enjoy San Francisco Bay and other waters for various recreational, educational, and spiritual purposes. Baykeeper's members' use and enjoyment of these waters are negatively affected by the pollution caused by BMC's operations.

This letter addresses BMC's unlawful discharge of pollutants from the Facility via stormwater into San Francisco Bay. Specifically, Baykeeper's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the National Pollutant Discharge Elimination System ("NPDES") General Permit No.



CALIFORNIA COASTKEEPER ALLIANCE   WATERKEEPER ALLIANCE FOUNDING MEMBER

Pollution hotline: 1 800 KEEP BAY
www.baykeeper.org

1736 Franklin Street, Suite 800
Oakland, CA 94612
(510) 735-9700

CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("Industrial Stormwater Permit").[1]

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of his or her intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur. As required by section 505(b), this Notice of Violation and Intent to File Suit provides notice to BMC of the violations that have occurred and which continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, Baykeeper intends to file suit in federal court against BMC under CWA section 505(a) for the violations described more fully below.

During the 60-day notice period, Baykeeper is willing to discuss effective remedies for the violations noticed in this letter. We suggest that BMC contact us within the next twenty (20) days so that these discussions may be completed by the conclusion of the 60-day notice period. Please note that we do not intend to delay the filing of a complaint in federal court, and service of the complaint shortly thereafter, even if discussions are continuing when the notice period ends.

## I.   THE LOCATION OF THE ALLEGED VIOLATIONS.

### A.  The Facility.

BMC's Facility is located at 1 Spinnaker Way in Berkeley, California. At the Facility, BMC operates a full service boat yard, where BMC engages in the following industrial activities: boat washing, boat stripping, boat sanding, boat hull repair, boat painting, and boat engine repair and maintenance. The Facility also maintains a fuel dock, material storage areas, and waste storage areas. Potential pollutants that may come in contact with stormwater include the following: sediment, heavy metals, diesel fuel, boat exterior maintenance products (sanding dust, paint, solvents), oil and grease, used oil, engine repair and maintenance products (coolant), gasoline, hydraulic oil/fluids, paint chips, litter, and other pollutants. The Facility routes stormwater into a sand filtration system and then discharges into the City of Berkeley's storm sewer system located at the northwestern property boundary, and then into San Francisco Bay. Process water from the Facility's boat washing area drains to a separate treatment system, which discharges to the East Bay Municipal Utility District's sanitary sewer. The Facility is located at the Berkeley Marina, on land leased by the City of Berkeley, and is bounded on the south and west sides by the Bay Trail and to the north by Cesar Chavez Park. BMC shares the property with the Olympic Circle Sailing Club, who use most of the boat slips at BMC's dock.

---

[1] On April 1, 2014, the State Water Resources Control Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, which has no force or effect until its effective date of July 1, 2015. As of the effective date, Water Quality Order No. 2014-57-DWQ will supersede and rescind the current Industrial Stormwater Permit except for purposes of enforcement actions brought pursuant to the current permit.

### B.  The Affected Water.

San Francisco Bay is a water of the United States.  The CWA requires that water bodies such as San Francisco Bay meet water quality objectives that protect specific "beneficial uses."  The beneficial uses of San Francisco Bay and its tributaries include commercial and sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered species, water contact and non-contact recreation, shellfish harvesting, fish spawning, and wildlife habitat.  Contaminated stormwater from the Facility adversely affects the water quality of the San Francisco Bay watershed and threatens the beneficial uses and ecosystem of this watershed, which includes significant habitat for listed rare and endangered species.

## II.   THE ACTIVITIES AT THE FACILITY CONSTITUTE VIOLATIONS OF THE CLEAN WATER ACT.

It is unlawful to discharge pollutants to waters of the United States, such as San Francisco Bay, without an NPDES permit or in violation of the terms and conditions of an NPDES permit.  CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of stormwater associated with industrial activities).  The Industrial Stormwater Permit authorizes certain discharges of stormwater, conditioned on compliance with its terms.

In 1998, BMC submitted a Notice of Intent ("NOI") to be authorized to discharge stormwater from the Facility under the Industrial Stormwater Permit.  However, information available to Baykeeper indicates that stormwater discharges from the Facility have violated several terms of the Industrial Stormwater Permit, thereby violating the CWA.  Apart from discharges that comply with the Industrial Stormwater Permit, the Facility lacks NPDES permit authorization for any other discharges of pollutants into waters of the United States.

### A.  Discharges in Excess of BAT/BCT Levels.

The Effluent Limitations of the Industrial Stormwater Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants[2] and best conventional pollutant control technology ("BCT") for conventional pollutants.[3]  Industrial Stormwater Permit, Order Part B(3).  EPA has published Benchmark values set at the maximum pollutant concentration present if an industrial facility is employing BAT and BCT, as listed in Attachment 1 to this letter.[4]

---

[2] BAT is defined at 40 C.F.R. § 442.23.  Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.
[3] BCT is defined at 40 C.F.R. § 442.22.  Conventional pollutants are listed at 40 C.F.R. § 401.16 and include BOD, TSS, oil and grease, pH, and fecal coliform.
[4] The Benchmark values are part of EPA's Multi-Sector General Permit ("MSGP") and can be found at: http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf.  *See* 73 Fed. Reg. 56,572 (Sept. 29, 2008)

BMC's self-reported exceedances of Benchmark values over the last five (5) years, identified in Attachment 1 to this letter, indicate that BMC has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the Industrial Stormwater Permit.  Baykeeper alleges and notifies BMC that its stormwater discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values for aluminum, iron, copper, and zinc.

BMC's ongoing discharges of stormwater containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that BMC has not developed and implemented sufficient Best Management Practices ("BMPs") at the Facility.  Proper BMPs could include, but are not limited to, moving certain pollution-generating activities under cover or indoors, capturing and effectively filtering or otherwise treating all stormwater prior to discharge, frequent sweeping to reduce the build-up of pollutants on-site, installing filters in downspouts and storm drains, and other similar measures.

BMC's failure to develop and/or implement adequate pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial Stormwater Permit each and every day BMC discharges stormwater without meeting BAT/BCT.  Baykeeper alleges that BMC has discharged stormwater containing excessive levels of pollutants from the Facility to San Francisco Bay during at least every significant local rain event over 0.1 inches in the last five (5) years.[5]  Attachment 2 compiles all dates in the last five (5) years when a significant rain event occurred.  BMC is subject to civil penalties for each violation of the Industrial Stormwater Permit and the CWA within the past five (5) years.

**B.  Discharges Impairing Receiving Waters.**

The Industrial Stormwater Permit's Discharge Prohibitions disallow stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.  *See* Industrial Stormwater Permit, Order Part A(2).  The Industrial Stormwater Permit also prohibits stormwater discharges to surface or groundwater that adversely impact human health or the environment.  *Id.* at Order Part C(1).  Receiving Water Limitations of the Industrial Stormwater Permit prohibit stormwater discharges that cause or contribute to an exceedance of applicable Water Quality Standards ("WQS").  *Id.* at Order Part C(2).  Applicable WQS are set forth in the California Toxics Rule ("CTR")[6] and Chapter 3 of

---

(Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities).  In the latest version of the permit, EPA has proposed the inclusion of Benchmark values for facilities that discharge into saltwater, which can be found at: http://water.epa.gov/polwaste/npdes/stormwater/upload/msgp2013_proposedpermit8.pdf.  *See* 78 Fed. Reg. 59,672 (Sept. 27, 2013) (Draft National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities).

[5] Significant local rain events are reflected in the rain gauge data available at: http://www.ncdc.noaa.gov/cdo-web/search.

[6] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31,682 (May 18, 2000).

Notice of Intent to File Suit
April 27, 2015
Page 5 of 9

the San Francisco Bay Basin (Region 2) Water Quality Control Plan ("Basin Plan").[7]  *See* Attachment 1.  Exceedances of WQS are violations of the Industrial Stormwater Permit, the CTR, and the Basin Plan.

The Basin Plan establishes WQS for San Francisco Bay and its tributaries, including but not limited to the following:

- Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

- Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.  Increases from normal background light penetration or turbidity relatable to waste discharge shall not be greater than 10 percent in areas where natural turbidity is greater than 50 NTU.

- All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

- Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  The Basin Plan, Table 3-3, identifies specific marine water quality objectives for toxic pollutants.[8]

Baykeeper alleges that BMC's stormwater discharges have caused or contributed to exceedances of the WQS set forth in the Basin Plan and CTR.  These allegations are based on BMC's self-reported data submitted to the San Francisco Bay Regional Water Quality Control Board, which indicates exceedances of receiving water limits for pH, copper, and zinc.  *See* Attachment 1.

Baykeeper alleges that each day that BMC has discharged stormwater from the Facility, BMC's stormwater has contained levels of pollutants that exceeded one or more of the applicable WQS in the San Francisco Bay.  Baykeeper alleges that BMC has discharged stormwater exceeding WQS from the Facility to San Francisco Bay during at least every significant local rain event over 0.1 inches in the last five (5) years.  *See* Attachment 2.  Each discharge from the Facility that has caused or contributed, or causes or contributes, to an exceedance of an applicable WQS constitutes a separate violation of

---

[7] The Basin Plan is published by the San Francisco Bay Regional Water Quality Control Board at: http://www.waterboards.ca.gov/sanfranciscobay/basin_planning.shtml#2004basinplan (Last accessed on 4/18/15).

[8] Basin Plan, Table 3-3 is available at: http://www.waterboards.ca.gov/rwqcb2/water_issues/programs/planningtmdls/basinplan/web/tab/tab_3-03.pdf (Last accessed on 4/18/15).

the Industrial Stormwater Permit and the CWA.  BMC is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA within the past five (5) years.

### C.   Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

The Industrial Stormwater Permit requires dischargers to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP").  Industrial Stormwater Permit, Section A(1)(a).  The Industrial Stormwater Permit also requires dischargers to make all necessary revisions to existing SWPPPs promptly.  *Id.* at Order Part E(2).

The SWPPP must include, among other requirements, the following:  a site map, a list of significant materials handled and stored at the site, a description and assessment of all potential pollutant sources, a description of the BMPs that will reduce or prevent pollutants in stormwater discharges, specification of BMPs designed to reduce pollutant discharge to BAT and BCT levels, a comprehensive site compliance evaluation completed each reporting year, and revisions to the SWPPP within 90 days after a facility manager determines that the SWPPP is in violation of any requirements of the Industrial Stormwater Permit.  *See* Industrial Stormwater Permit, Section A.

Based on information available to Baykeeper, BMC has failed to prepare and/or implement an adequate SWPPP and/or to revise the SWPPP to satisfy each of the requirements of Section A of the Industrial Stormwater Permit.  For example, BMC's SWPPP does not include, and BMC has not implemented, adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels in accordance with Section A(8) of the Industrial Stormwater Permit, as evidenced by the data in Attachment 1.  In particular, the Facility's current SWPPP (dated January 23, 2012) admits that the sand filtration system "has not proven effective" in controlling certain pollutants, but no improvements to system have been made.  The SWPPP also improperly claims to achieve the lesser "maximum extent practicable" standard for pollution control that is applicable to municipal, not industrial, sources of stormwater.

Accordingly, BMC has violated the CWA each and every day that it has failed to develop and/or implement an adequate SWPPP meeting all of the requirements of Section A of the Industrial Stormwater Permit, and BMC will continue to be in violation every day until it develops and/or implements an adequate SWPPP.  BMC is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA occurring within the past five (5) years.

### D.   Failure to Develop and Implement an Adequate Monitoring and Reporting Program and to Perform Annual Comprehensive Site Compliance Evaluations.

The Industrial Stormwater Permit requires facility operators to develop and implement a Monitoring and Reporting Program ("MRP").  Industrial Stormwater Permit, Section B(1) and Order Part E(3).  The Industrial Stormwater Permit requires that the

MRP ensure that each facility's stormwater discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial Stormwater Permit. *Id*. at Section B(2). Facility operators must ensure that their MRP practices reduce or prevent pollutants in stormwater and authorized non-stormwater discharges as well as evaluate and revise their practices to meet changing conditions at the facility. *Id*. This may include revising the SWPPP as required by Section A of the Industrial Stormwater Permit.

The MRP must measure the effectiveness of BMPs used to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges, and facility operators must revise the MRP whenever appropriate. *Id*. at Section B(2). The Industrial Stormwater Permit requires facility operators to visually observe and collect samples of stormwater discharges from all drainage areas. *Id*. at Section B(7). Facility operators are also required to provide an explanation of monitoring methods describing how the facility's monitoring program will satisfy these objectives. *Id*. at Section B(10).

BMC has been operating the Facility with an inadequately-developed and/or inadequately-implemented MRP, in violation of the substantive and procedural requirements set forth in Section B of the Industrial Stormwater Permit. For example, the data in Attachment 1 indicates that BMC's monitoring program has not ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit as required by Section B(2). The monitoring program has not resulted in practices at the Facility that adequately reduce or prevent pollutants in stormwater as required by Section B(2). Similarly, the data in Attachment 1 indicate that BMC's MRP has not effectively identified or responded to compliance problems at the Facility or resulted in effective revision of BMPs in use or the Facility's SWPPP to address such ongoing problems as required by Section B(2).

As a result of BMC's failure to adequately develop and/or implement an adequate MRP at the Facility, BMC has been in daily and continuous violation of the Industrial Stormwater Permit and the CWA each and every day for the past five (5) years. These violations are ongoing. BMC will continue to be in violation of the monitoring and reporting requirements each day that BMC fails to adequately develop and/or implement an effective MRP at the Facility. BMC is subject to penalties for each violation of the Industrial Stormwater Permit and the CWA occurring for the last five (5) years.

### E.   Discharges Without Permit Coverage.

Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge is authorized by a NPDES permit issued pursuant to section 402 of the CWA. *See* 33 U.S.C. §§ 1311(a), 1342. BMC sought coverage for the Facility under the Industrial Stormwater Permit, which states that any discharge from an industrial facility not in compliance with the Industrial Stormwater Permit "must be either eliminated or permitted by a separate NPDES permit." Industrial Stormwater Permit, Order Part A(1). Because BMC has not obtained coverage under a separate

NPDES permit and has failed to eliminate discharges not permitted by the Industrial Stormwater Permit, each and every discharge from the Facility described herein not in compliance with the Industrial Stormwater Permit has constituted and will continue to constitute a discharge without CWA permit coverage in violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

## IV.    PERSONS RESPONSIBLE FOR THE VIOLATIONS.

Berkeley Marine Center, Inc. and the City of Berkeley are the persons responsible for the violations at the Facility described above.

## V.    NAME AND ADDRESS OF NOTICING PARTY.

Our name, address, and telephone number is as follows:

San Francisco Baykeeper
1736 Franklin Street, Suite 800
Oakland, CA 94612
(510) 735-9700

## VI.    COUNSEL.

Baykeeper is represented by the following counsel in this matter, to whom all communications should be directed:

Nicole C. Sasaki, Associate Attorney
George Torgun, Managing Attorney
San Francisco Baykeeper
1736 Franklin Street, Suite 800
Oakland, CA 94612
(510) 735-9700

Nicole C. Sasaki: (510) 735-9700 x110, nicole@baykeeper.org
George Torgun: (510) 735-9700 x105, george@baykeeper.org

## VII.    REMEDIES.

Baykeeper intends, at the close of the 60-day notice period or thereafter, to file a citizen suit under CWA section 505(a) against BMC for the above-referenced violations. Baykeeper will seek declaratory and injunctive relief to prevent further CWA violations pursuant to CWA sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), and such other relief as permitted by law.  In addition, Baykeeper will seek civil penalties pursuant to CWA section 309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, against BMC in this action.  The CWA imposes civil penalty liability of up to $37,500 per day per violation for violations occurring after January 12, 2009.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

Notice of Intent to File Suit
April 27, 2015
Page 9 of 9

Baykeeper will seek to recover attorneys' fees, experts' fees, and costs in accordance with CWA section 505(d), 33 U.S.C. § 1365(d).

      As noted above, Baykeeper is willing to meet with you during the 60-day notice period to discuss effective remedies for the violations noted in this letter.  Please contact Nicole or George to initiate these discussions.

Sincerely,

_____

Nicole C. Sasaki
Associate Attorney
San Francisco Baykeeper

Cc:

| | |
|---|---|
| Gina McCarthy<br>Administrator<br>US EPA, William Jefferson Clinton Bldg.<br>1200 Pennsylvania Avenue, N.W.<br>Mail Code: 1101A<br>Washington, DC 20460 | Bruce Wolfe<br>Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street, Suite 1400<br>Oakland, CA 94612 |
| Jared Blumenfeld<br>Regional Administrator<br>U.S. EPA - Region 9<br>75 Hawthorne Street<br>San Francisco, CA 94105 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>1001 I Street<br>Sacramento, CA 95814 |

**Attachment 1:  EPA Benchmarks, Water Quality Standards for Discharges to Marine Waters, and Table of Exceedances**

## A. EPA Benchmarks, 2008 and Proposed 2013 Multi-Sector General Permit ("MSGP")

| Parameter | Units | Benchmark value | Source |
|---|---|---|---|
| Aluminum Total | mg/L | 0.75 | 2008 MSGP |
| Iron Total | mg/L | 1.0 | 2008 MSGP |
| Copper Total | mg/L | 0.0048 | 2013 MSGP* |
| Zinc Total | mg/L | 0.09 | 2013 MSGP* |

**\*** Benchmark values for lead, zinc, and copper are found in the proposed 2013 MSGP, which includes specific benchmarks for discharges into saltwater.  All other benchmarks are included in both the 2008 MSGP and the proposed 2013 MSGP.

## B.  Water Quality Standards (Basin Plan, Tables 3-3, 3-3A)

| Parameter | Units | WQS value | Source |
|---|---|---|---|
| pH | SU | 6.5 – 8.5 | Basin Plan |
| Copper | mg/L | 0.0094 | Basin Plan |
| Zinc | mg/L | 0.09 | Basin Plan |

## C. Table of Exceedances for Berkeley Marine Center

Table containing each stormwater sampling result which exceeds EPA Benchmarks or causes or contributes to Basin Plan Water Quality Standards listed above.  All stormwater samples were reported by the Facility during the past five (5) years.

| No. | Sampling Date | Parameter | | Value | Units | Wet Season |
|---|---|---|---|---|---|---|
| 1 | 12/8/2010 | Aluminum Total | = | 1.03 | mg/L | 2010-2011 |
| 2 | 1/23/2012 | Aluminum Total | = | 2.27 | mg/L | 2011-2012 |
| 3 | 11/30/2012 | Aluminum Total | = | 2.94 | mg/L | 2012-2013 |
| 4 | 4/1/2013 | Aluminum Total | = | 0.751 | mg/L | 2012-2013 |
| 5 | 12/8/2010 | Copper Total | = | 0.166 | mg/L | 2010-2011 |
| 6 | 2/16/2011 | Copper Total | = | 0.185 | mg/L | 2010-2011 |
| 7 | 1/23/2012 | Copper Total | = | 0.0554 | mg/L | 2011-2012 |
| 8 | 11/30/2012 | Copper Total | = | 0.164 | mg/L | 2012-2013 |
| 9 | 4/1/2013 | Copper Total | = | 0.177 | mg/L | 2012-2013 |
| 10 | 11/20/2013 | Copper Total | = | 0.424 | mg/L | 2013-2014 |
| 11 | 12/8/2010 | Iron Total | = | 1.71 | mg/L | 2010-2011 |
| 12 | 1/23/2012 | Iron Total | = | 2.14 | mg/L | 2011-2012 |
| 13 | 11/30/2012 | Iron Total | = | 3.11 | mg/L | 2012-2013 |
| 14 | 4/1/2013 | Iron Total | = | 1.16 | mg/L | 2012-2013 |
| 15 | 4/1/2013 | pH | = | 6.4 | SU | 2012-2013 |
| 16 | 11/20/2013 | pH | = | 6.4 | SU | 2013-2014 |
| 17 | 12/8/2010 | Zinc Total | = | 0.184 | mg/L | 2010-2011 |

## Attachment 2: Alleged Dates of Exceedances by Berkeley Marine Center, April 27, 2010 to April 27, 2015

Days with precipitation one-tenth of an inch (0.01) or greater, as reported by NOAA's National Climatic Data Center; Berkeley, California station* when a stormwater discharge from the Facility is likely to have occurred.   http://www.ncdc.noaa.gov/cdo-web/search

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| 4/27 | 1/1 | 1/19 | 1/7 | 2/2 | 2/6 |
| 4/28 | 1/2 | 1/20 | 1/23 | 2/5 | 2/8 |
| 5/10 | 1/13 | 1/21 | 2/7 | 2/6 | 3/23* |
| 5/17 | 1/29 | 1/22 | 2/19 | 2/7 | |
| 5/25 | 1/30 | 1/23 | 3/5 | 2/8 | |
| 5/27 | 2/14 | 2/7 | 3/6 | 2/9 | |
| 10/17 | 2/15 | 2/12 | 3/19 | 2/26 | |
| 10/22 | 2/16 | 2/13 | 3/20 | 2/28 | |
| 10/23 | 2/17 | 2/15 | 3/31 | 3/5 | |
| 10/24 | 2/18 | 2/29 | 4/1 | 3/26 | |
| 10/29 | 2/19 | 3/1 | 4/4 | 3/27 | |
| 11/7 | 2/24 | 3/13 | 6/25 | 3/29 | |
| 11/19 | 2/25 | 3/14 | 9/21 | 3/31 | |
| 11/20 | 3/2 | 3/15 | 11/19 | 4/1 | |
| 11/21 | 3/6 | 3/16 | 11/20 | 4/4 | |
| 11/23 | 3/13 | 3/24 | 12/6 | 4/25 | |
| 11/27 | 3/14 | 3/25 | | 9/25 | |
| 12/5 | 3/15 | 3/27 | | 10/25 | |
| 12/6 | 3/18 | 3/31 | | 10/31 | |
| 12/8 | 3/19 | 4/10 | | 11/19 | |
| 12/9 | 3/20 | 4/11 | | 11/20 | |
| 12/14 | 3/22 | 4/12 | | 11/22 | |
| 12/17 | 3/23 | 4/17 | | 11/29 | |
| 12/18 | 3/24 | 4/26 | | 11/30 | |
| 12/19 | 3/25 | 10/22 | | 12/2 | |
| 12/21 | 3/26 | 10/23 | | 12/3 | |
| 12/22 | 4/21 | 10/31 | | 12/6 | |
| 12/25 | 4/24 | 11/1 | | 12/11 | |
| 12/28 | 5/14 | 11/9 | | 12/12 | |
| 12/29 | 5/15 | 11/16* | | 12/14 | |
| | 5/16 | 11/17* | | 12/15 | |
| | 5/17 | 11/18* | | 12/16 | |
| | 5/25 | 11/28* | | 12/17 | |
| | 5/28 | 11/30 | | 12/19 | |
| | 5/31 | 12/3 | | | |
| | 6/4 | 12/5 | | | |
| | 6/28 | 12/12 | | | |
| | 6/29* | 12/17 | | | |
| | 10/3 | 12/22* | | | |
| | 10/4 | 12/23* | | | |
| | 10/5 | 12/26* | | | |
| | 10/6 | 12/29* | | | |

---

* Data reported by Richmond, California station.

|  | 10/10 | 12/31 |  |  |  |
|---|---|---|---|---|---|
|  | 10/11 |  |  |  |  |
|  | 11/3 |  |  |  |  |
|  | 11/5 |  |  |  |  |
|  | 11/11 |  |  |  |  |
|  | 11/18 |  |  |  |  |
|  | 11/19 |  |  |  |  |
|  | 11/20 |  |  |  |  |
|  | 11/24 |  |  |  |  |